Pak & Whang PC
Tae Hyun Whang (TW-9226)
12 West 32nd Street
Suite 1200
New York, NY 10001
Tel: (212) 239-2378
Fax: (212) 239-8732

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

CHLOE, S.A.S., J. CHOO LIMITED,                Case No.: 07 CIV 6491

                Plaintiffs,

        -against-

KEN CHEN a/k/a SHU CHEN a/k/a XIANG
CHEN, DANIEL DOE, GODDESS TRADING
d/b/a GODDESSTRADING@HOTMAIL.COM,
LUXUNG GOODS, LUXURY GOODS,
TERRY DOE d/b/a
AZNTERRY911@HOTMAIL.COM, JASON DOE
d/b/a JARRY326@YAHOO.COM.CN, FASHION
HANDBAGS, BENNY DOE, JEANCARLO DOE,
JOSHEPH a/k/a JOSE DOE, SISI a/k/a CECI DOE,
TOP LUXURY HANDBAGS d/b/a
LUXURYHANDBAGS277@YAHOO.COM,
FRANCISCO DOE, BEN DOE, CARLOS DOE,
INSTYLE LUXURY HANDBAGS, CORINA
DOE a/k/a QIMIAO HU a/k/a QI MIAO HU,
KENNY DOE a/k/a YE GUO a/k/a GUO Q YE,
NEWCOME TRADING d/b/a TOSCA, QUICK
GLOBAL SHIPPING, HOWARD EXPRESS
SHIPPING, RANDY DOE, and various JOHN and
JANE DOES 1-10 and XYZ COMPANIES
(UNIDENTIFIED),

                Defendants.

-----------------------------------------------------------------X

**AFFIDAVIT OF JAE MAN YOO IN OPPOSITION TO PRELIMINARY INJUNCTION
AND FOR THE DISSOLUTION AND MODIFICATION OF THE COURT'S ORDER AS
TO PSK AMERICA, INC. AND JAE MAN YOO**

STATE OF NEW YORK      )
                                              ) ss.:
COUNTY OF NEW YORK )

  JAE MAN YOO, being duly sworn, deposes and says:

1. I am the president, sole shareholder and officer of P.S.K. America, Inc. ("PSK"). Upon information and belief, PSK is an unidentified company referred in the caption as an "XYZ Company" and I am an unidentified individual referred in the caption as "John Doe." I make this affidavit in opposition to plaintiffs' application for a preliminary injunction and for the dissolution or modification of this Court's Order dated July 19, 2007 as to P.S.K. America, Inc. and Jae Man Yoo. For the reasons stated herein, it is respectfully requested that this Court enter an order (1) denying plaintiffs' application for a preliminary injunction as to PSK and me, (2) immediately releasing bank accounts belonging to PSK and me and (3) awarding damages, costs and expenses, including reasonable attorney's fees to me and (4) granting any further relief that this Court deems just and proper. Alternatively, it is respectfully requested that this Court modify its order to allow P.S.K. America, Inc. and Jae Man Yoo to make necessary payments from bank accounts which have been frozen.

### Background Facts

2. PSK owns and operates a small retail store which sells costume jewelry and hair extensions at 420 Broadway also known as 277 Canal Street, Store G, New York, NY 10013 (the "Premises"). PSK is the tenant for the Premises and currently utilizes the northern portion of the Premises. The entrance to the Premises is located on Broadway in the building located

on the northwest corner of Canal Street and Broadway in the Chinatown section of New York City. I am PSK's sole owner, director, officer and employee.

3. As is prevalent in Chinatown, the Premises is shared by numerous merchants. PSK leases the Premises from the landlord. PSK uses the southeastern portion of the Premises to operate a retail costume jewelry and hair extension business. PSK subleases the remainder of the Premises to four (4) subtenants, including Yu Lin ("Lin"). Each occupant at the Premises (PSK and each subtenant) operates their own business independent of one another. Upon information and belief, Lin is a defendant identified in the caption as "Benny Doe". Lin subleases the northeastern of the Premises and sells handbags.

4. PSK currently holds a month-to-month lease, which the landlord, 277 Assoc. LLC, has elected to terminate. I am currently attempting to negotiate a lease with the landlord. A copy of the expired lease is annexed hereto as Exhibit A. Lin, as a subtenant, has two month-to-month subleases with PSK. There are two subleases executed between Lin and Suzy Palace, Inc. (the former over-tenant). [Suzy Palace, Inc. ("Suzy") was owned by my wife's sister-in-law. Suzy also sold costume jewelry and hair extensions (wigs). Suzy subleased the premises from Top Design Fashion, Inc. ("Top Design"). In March, 2006, the landlord evicted Top Design and Suzy from the Premises because Top Design failed to pay rent. PSK entered into a new lease with the landlord on March 22, 2006 and continued operating a retail store selling costume jewelry and hair extensions.] The parties executed the first sublease in December, 2005 and executed the second sublease in January, 2006 when Lin wanted additional space. Copies of the subleases are annexed hereto as Exhibit B. The subleases specifically provide that Lin cannot sell counterfeit goods.

5.  PSK's lease with the landlord specifically states that PSK cannot sell counterfeit merchandise and assesses severe penalties for any such violations. (See Lease, Exhibit A, Paragraph 79 of Rider at pages 14-15.) My company does not sell any counterfeit merchandise and does not allow its subtenants to sell counterfeit merchandise.

6.  On July 20, 2007, plaintiffs and their agents came to the Premises and confiscated some handbags from the Premises. The confiscated handbags belong to Lin. Plaintiffs also seized lots of documents from Lin and PSK. Plaintiffs served me with papers which my attorney informs me were redacted copies of the Complaint and the Temporary Restraining Order, Seizure Order, Order Restraining the Transfer of Assets, Order for Expedited Discovery, and Order to Show Cause for Preliminary Injunction.

7.  Plaintiffs also placed holds on PSK's business accounts. As such, my company's business has been disrupted. My company is not able to pay its vendors or make other payments.

8.  Plaintiffs also placed holds on <u>my personal bank accounts</u>. As such, I am not able to use my personal bank accounts.

### Plaintiffs' Claims of Counterfeiting

9.  Plaintiffs' papers in support of plaintiffs' application for a preliminary injunction show that plaintiffs are targeting individuals and groups who are selling counterfeit merchandise. Neither PSK nor I sell counterfeit merchandise. The Court's attention is directed to the fact that neither PSK nor I are named as defendants in the caption nor are we mentioned in papers which support plaintiffs' ex parte application.

10. The declaration of Kimberly J. McCarthy in support of plaintiffs' application shows that Ms. McCarthy purchased a handbag at the Premises from Lin a/k/a Benny using PSK's credit card machine from "Benny". (See Declaration of Kimberly J. McCarthy in Support of Plaintiffs' Ex Parte Application, Paragraphs 39 – 40 at pages 10-11.)

11. PSK is the only occupant at the Premises which has a credit card machine, and from time to time, PSK allows its subtenants to use the credit card machine. As with all businesses, cash is the preferred method of payment because there are no fees charged to cash transactions. However, merchants accept credit cards because making a sale and paying the transaction fee is better than not making the sale. In these instances, the subtenants would bring the customer with their credit card to make the purchase to PSK's counter where the credit card machine is located. The customer and the subtenant may bring the item being purchased, but most times, the item being purchased is already in a bag or not brought to PSK's counter. PSK does not make a profit when subtenants use its credit card machine. When charges are made on the credit card machine by subtenants, PSK would wait perhaps 2 to 3 weeks to make sure the charges are not returned by the credit card company. When PSK is paid by the credit card company, it would segregate the sales tax charged and from the net sale charge, give its subtenant the charged amount, less 3.5% as an offset for fees charged by the credit card companies and for the cost of renting the credit card machine and telephone line.

12. PSK keeps a detailed record of all sales that it makes and what credit card charges were made by each subtenant. Ms. McCarthy's declaration states that on June 5, 2007, she purchased an item from Lin a/k/a Benny for $211.33 at the Premises. PSK's records confirm that on June 5, 2007, Lin used PSK's credit card machine to charge that amount. PSK's records shows the following: (1) Lin used the credit card machine for a $195.00 sale and

$16.33 was set aside for sales taxes; (2) on June 5, 2007, Lin made sales totaling $2,133.00, Sakawat (a subtenant who sells belts and perfumes) made a sale of $45.00, Au (a sub-subtenant who sells watches) made sales totaling $150.00 and PSK made a sale of $270.94 on PSK's credit card machine; (3) a total of $194.16 was set aside sales tax for sales made by the subtenants; (4) PSK made $119.00 in cash sales and the total of PSK's credit card sales and sales tax set aside for the subtenants' sale was $467.10; and (5) PSK gave Sakawat for his charge less three and one-half percent for costs, and gave Lin for the charges less three and one-half percent for costs and gave Au for the charges less three and one-half percent for costs. A copy of PSK's record for June 5, 2007 is annexed hereto as Exhibit C.

13.   Neither PSK nor I are involved in any counterfeiting. PSK sells costume jewelry and hair extensions and does not sell counterfeit handbags. We are not involved in any manner with the sale, manufacture or distribution of counterfeit handbags.

### Seizure of Goods

14.   On the morning of July 20, 2007, plaintiffs' agents came to the Premises. At the time, PSK was open for business, but Lin was not yet open. As such, the northeastern portion of the Premises which is occupied by Lin was covered with a sheet. A photograph of the sheet covering Lin's handbags is annexed hereto as Exhibit D. Lin also has glass display showcases, but these showcases were not covered by the sheet because they were locked. Plaintiffs' agents came to the Premises, removed the sheet and began gathering handbags and documents belonging to Lin. They also began looking through PSK's books and records as well as my personal records.

15. I explained to plaintiffs' agent, who I later found out was an attorney named Scott Gelin, that PSK only sells costume jewelry and hair extensions, but he proceeded to tell me that plaintiffs had the right to review and seize my records. There is a sign next to PSK's cash register which states, "Store Policy, No Return, No Exchange on Costume Jewelry & Hair Ext., Please inspect your purchased items thoroughly before leaving. Thank you shopping with us," which supports the fact that PSK only sells costume jewelry and hair extensions. Plaintiffs proceeded to go through all of my business and personal records and seized a box full of records. Needless to say, PSK's business was disrupted that day.

16. Despite the fact that a curtain covered Lin's handbags and my strong protests that PSK only sold costume jewelry and hair extensions, plaintiffs' agents failed and refused to make the distinction between PSK costume jewelry business and Lin's handbag business. Plaintiffs mingled Lin's handbags and documents with PSK's documents and issued a single receipt for all items. A copy of plaintiffs' receipt for seized property is annexed hereto as Exhibit E.

17. PSK has a policy of cooperating with any trademark owner that notifies PSK of possible infringing activity. This policy stem from the fact that (1) counterfeiting is wrong and unlawful, (2) PSK does not sell counterfeit items nor does it allow its subtenants to sell counterfeit items and (3) trademark owners have very deep pockets and even though PSK is not involved in any counterfeiting, it is more economical to work with them than to litigate the matter in court. PSK gives full disclosure and the trademark owners usually realize that PSK is not involved with any counterfeiting and does not allow counterfeiting at the Premises. For example, last year, PSK was sued by Louis Vuitton Mallatier. Upon information and belief, it was Lin who sold the counterfeit bag. As such, PSK entered into a settlement with Louis

Vuitton where PSK, without admitting wrongdoing, agreed to a permanent injunction not to sell counterfeit Louis Vuitton merchandise. Additionally, the attorneys for Louis Vuitton advised PSK that a counterfeit Marc Jacobs handbag was purchased at the Premises. Since PSK does not sell counterfeit handbags (or any handbags for that matter), PSK agreed to amend the case to include Marc Jacobs as a plaintiff and without admitting wrongdoing, agreed to a permanent injunction not to sell counterfeit Marc Jacobs merchandise. After the lawsuit with Louis Vuitton and Marc Jacobs, I warned and prohibited Lin from selling counterfeit merchandise. When my attorney wrote me a letter regarding Louis Vuitton, Marc Jacobs and other trademarks, I gave a copy of the letter to Lin and had him acknowledge that he will not sell any counterfeit merchandise. A copy of the letter is annexed hereto as Exhibit F.

18. PSK does not sell counterfeit merchandise and prohibits its subtenants from selling counterfeit merchandise. From time to time, the subtenants had some goods seized as being counterfeit. In those instances, the seizing party serves documents and gives a receipt. I keep the documents and receipts and warn the subtenants not to sell counterfeit goods. Unfortunately, I did not grow up in the United States and I am not familiar with trademarks. However, I make my best effort to prevent counterfeit items from being sold at the Premises.

19. If I know that a particular item is counterfeit, I will prevent the sale of counterfeit item. However, I am not an expert and I do not know whether an item is a counterfeit, unless I am told it is counterfeit. For example, I did not know that Marc Jacobs was a trademark until my attorney received a letter from their attorney, but when I found out, I made sure that neither PSK nor the subtenants sold any Marc Jacobs merchandise. Additionally, I did not know that Chloe and Jimmy Choo were trademarks until July 20, 2007 when plaintiffs seized the handbags from Lin. Plaintiffs did not give notice that counterfeit goods were being sold at the

Premises. If PSK or I received such notice from the plaintiffs, I could have acted to prevent Lin from selling these items.

20. On July 25, 2007, I discovered that PSK's bank accounts were frozen. I also discovered that my individual bank accounts were frozen. The funds in our bank accounts are not from the sale of counterfeit goods. PSK's bank account at Wilshire State Bank is solely from the sale of costume jewelry and hair extensions by PSK and the restraint on the account should be immediately released. PSK's bank account at Valley National Bank are from card sales and include sales proceeds from sales by PSK as wells as sales proceeds from subtenants. The proceeds from the sale of PSK's merchandise are not from counterfeit merchandise and to the best of my knowledge, the sale proceeds from the sale of the subtenants' merchandise, are not from the sale of counterfeit merchandise. As to Lin's merchandise, I originally thought that they were not counterfeit. As such, I request that PSK's account at Valley National Bank be released. The funds in my individual bank accounts are not from the sale of counterfeit merchandise and the restrains on my personal bank accounts should be immediately released. I requested my attorney to write a letter to plaintiffs' attorneys to request that the plaintiffs discontinue the action against PSK and me and to release our bank accounts. My attorney's letter explained that PSK sells costume jewelry and does not sell handbags. Additionally, I had my attorney forward documents, including copies of subleases, which show that defendant Benny Doe's true identity is Lin. (Plaintiffs' agents reviewed these important documents, but did not seize them.) Since we do not sell counterfeit handbags, we even advised plaintiffs that we would agree to a permanent injunction not to sell counterfeit merchandise which infringe on the plaintiffs' trademarks. My attorneys also advised plaintiffs that PSK will take steps to evict Lin from the Premises so that no further counterfeiting occurs at the Premises. Copies of my

attorney's letter and documents which were forwarded to plaintiffs' attorneys are annexed hereto as Exhibit G. To my disappointment, plaintiffs' attorneys rejected our offer.

21. The documents seized by plaintiffs, which were returned to my attorneys on July 27, 2007, show that PSK is involved only in the costume jewelry business. Plaintiffs seized all invoices from PSK's suppliers. There were more than one hundred (100) pages of invoices for costume jewelry but there were no invoices for belts, sunglasses, t-shirts or handbags, which are sold by other businesses at the Premises. By reviewing the seized documents, plaintiffs should have known that PSK and I were not involved in the counterfeiting; however, they refused to release our bank accounts.

22. Plaintiffs also seized copies of receipts which I issued to the subtenants for the payment of rent. These receipts show that there are subtenants at the Premises and each operate separate businesses. Copies of receipts given to subtenants for the payment of rent in July, 2007 are annexed hereto as Exhibit H. (PSK has four (4) subtenants, but six (6) receipts are given because two subtenants have sub-subtenants and each occupant pays their rent separately.)

23. Plaintiffs also seized personal, confidential and privileged communications which they have no right to view or seize. Plaintiffs seized notices from my healthcare company and copies of privileged communications from attorneys for both PSK matters and personal matters.

24. I am very surprised that the plaintiffs can come into PSK's business and seize my company's records, without evening naming PSK as a defendant. I am even more surprised that plaintiffs were allowed to freeze bank accounts belonging to PSK and me. Plaintiffs do not name PSK or me as defendants. Plaintiffs' application contains no proof that PSK or I are involved in counterfeiting. In fact, plaintiff's complaint and application do not make any

allegations against PSK or me. As to me individually, there are no proofs or allegations that I am individually involved in any counterfeiting. I understand that plaintiffs want to protect their trademarks and prevent counterfeiting. However, plaintiffs have exceeded the scope of this Court's Order by seizing PSK's documents and restraining bank accounts belonging to PSK and me. My attorneys inform me that the various laws are designed to protect their merchandise, but these laws should not be used by plaintiffs as a sword to attack legitimate businesses which have nothing to do with plaintiffs' products. Plaintiffs, with deep pockets, have forced PSK and me to use our valuable resources to remove the unlawful restraints put on our bank accounts.

25.     As previously mentioned, PSK has taken steps so that counterfeit goods are not sold at the Premises. PSK told Lin that he is no longer wanted as a subtenant, and Lin moved out from the Premises on July 31, 2007. A picture of the space which Lin vacated is annexed hereto as Exhibit I. Lin was paying $6,500.00 per month for rent and PSK is now looking for a new subtenant.

### Dissolution or Modification of Order Freezing Assets

26.     Hopefully, I have demonstrated to this Court's satisfaction that PSK and I are not involved in counterfeiting and this Court will dissolve the order freezing PSK and my bank accounts. PSK and I were not named as defendants in this action, yet our bank accounts were frozen. Plaintiffs' ex parte application lacks any evidence that neither PSK nor I are involved in counterfeiting. In fact, plaintiffs' papers fail to even allege that PSK or I are involved in counterfeiting, yet plaintiffs have managed to freeze our bank accounts. We sell costume jewelry and hair extensions, as evidenced by the invoices and catalogs which plaintiffs seized.

27.     In the event that this Court does not dissolve its order freezing PSK's assets, it is respectfully requested that this Court modify its order to allow PSK to make regular payments.

First, PSK must make payments to its suppliers to purchase inventory, which amounts will vary from time to time. Second, PSK needs to make monthly payments of rent ($21,000.00) and electricity ($400.00) to its landlord. Third, PSK needs to pay its sole employee. Although I do not have a fixed salary, I averaged $1,500.00 per month this year. My salary from PSK is $1,500.00 per month and I also receive additional amounts depending on profits. PSK does not have any other assets to pay its expenses.

28. In the event that this Court does not dissolve its order freezing my individual assets, it is respectfully requested that this Court modify its order to allow me to make the following payments. First, my daughter is starting her first semester at college and I have been saving money for her tuition, room and board. A payment of $7,790.00 is due for tuition, room and board on August 15, 2007. A copy of the statement is annexed hereto as Exhibit J. Second, I need to make monthly payments of rent ($1,750.00), make car payments and insurance ($500.00) and pay utilities ($400.00). Third, I need $400.00 for other miscellaneous living expenses such as food. I do not have any other assets to pay these expenses.

WHEREFORE, it is respectfully requested that this Court enter an order order (1) denying plaintiffs' application for a preliminary injunction as to PSK and me, (2) immediately releasing bank accounts belonging to PSK and me and (3) awarding damages, costs and expenses, including reasonable attorney's fees to me and (4) granting any further relief that this Court deems just and proper. Alternatively, it is respectfully requested that this Court modify its order to allow P.S.K. America, Inc. and Jae Man Yoo to make necessary payments from bank accounts which have been frozen.

_____
Jae Man Yoo

Sworn to before me on the
_1st_ day of August, 2007

_____
Notary Public

TAE H WHANG
NOTARY PUBLIC State of New York
NO. 02WH6011794
Qualified in Rockland County
Commission Expires June 15, 2011

Affidavit of Jae Man Yoo
Chloe v. Ken Chen
Docket No.: 07 CIV 6491